## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATRICK BURKE, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>NEW YORK BLOOD CENTER, INC. d/b/a NEW YORK BLOOD CENTER ENTERPRISES,<br><br>　　　　　Defendant. | Case No. _____<br><br><br>CLASS ACTION<br><br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Patrick Burke ("Plaintiff"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through his attorneys, brings this Class Action Complaint against Defendant New York Blood Center, Inc. d/b/a New York Blood Center Enterprises ("NYBC" or "Defendant"), and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters.

## INTRODUCTION

1.　　Plaintiff brings this class action against Defendant for its failure to secure and safeguard approximately 193,822 individuals' (including Plaintiff's) personally identifying information ("PII") and personal health information ("PHI"), including names, demographic information, Social Security numbers, driver's license or other government identification card numbers, health information, and test results.

2.　　NYBC is one of the largest community-based, non-profit blood collection and distribution organizations in the United States.

3.      Between approximately January 20 and January 26, 2025, an unauthorized third party gained access to NYBC's network systems and accessed and acquired files containing the PII/PHI of NYBC's patients, including Plaintiff and Class members (the "Data Breach").

4.      Defendant owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Defendant breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure.

5.      As a result of Defendant's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose PII/PHI was exposed as a result of the Data Breach, which occurred between approximately January 20 and January 26, 2025.

6.      Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, negligence per se, breach of fiduciary duty, unjust enrichment, breach of implied contract, and violations of the Connecticut Unfair Trade Practices Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

*Plaintiff Patrick Burke*

7. Plaintiff is a citizen and resident of Connecticut.

8. Plaintiff is a long-time blood donor who has donated blood through NYBC. As a condition of providing blood donation services, NYBC required Plaintiff to provide it with his PII/PHI.

9. Based on representations made by NYBC, Plaintiff believed that NYBC had implemented and maintained reasonable security practices to protect his PII/PHI. With this belief in mind, Plaintiff provided his PII/PHI to NYBC in connection with donating blood.

10. At all relevant times, NYBC stored and maintained Plaintiff's PII/PHI on its network systems, including the systems impacted in the Data Breach.

11. Plaintiff received a notice letter dated September 5, 2025, from NYBC notifying him that his PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

12. Had Plaintiff known that NYBC does not adequately protect the PII/PHI it collects and maintains, he would not have agreed to provide his PII/PHI to, or donated blood to, NYBC.

13. As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of his PII/PHI.

***Defendant New York Blood Center, Inc.***

14.    Defendant New York Blood Center, Inc. is a New York nonprofit corporation with its principal place of business located at 310 E. 67th Street, New York, NY 10065. It may be served through its registered agent: Community Blood Council of Greater New York, Inc., 310 E. 67th Street, New York, NY 10065.

## JURISDICTION AND VENUE

15.    The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

16.    This Court has general personal jurisdiction over Defendant because it is organized under the laws of this State and maintains its principal place of business in this District.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of NYBC*

18.    NYBC "is one of the largest community-based, non-profit blood collection and distribution organizations in the United States."[1] NYBC "collects approximately 4,000 units of blood products each day" and serves local communities in New York, New

---

[1] *Who We Are*, NYBC, https://www.nybce.org/about-us/who-we-are/#accordion-item-newyorkbloodcenter (last accessed Sept. 18, 2025).

Jersey, Connecticut, Pennsylvania, Delaware, Maryland, Virginia, Missouri, Kansas, Minnesota, Nebraska, Rhode Island, and Southern New England.[2]

19.     NYBC also provides "one million blood products, more than 450,000 laboratory and multi-assay infectious disease tests, and over 12,500 specialty clinical procedures to hospitals nationwide."[3]

20.     In the regular course of its business, NYBC collects and maintains the PII/PHI of its patients who donate blood and to whom it provides medical care, including Plaintiff and Class members. NYBC requires its patients to provide it with their PII/PHI, including the information stolen in the Data Breach, before it provides them blood donation services or other medical care.

21.     NYBC promises its "goal is to protect and maintain the integrity and confidentiality of our patient's health information."[4]

22.     NYBC represents "[s]trict security measures are in place to protect your privacy" to patients who donate blood.[5] It further assures patients that only "select, authorized blood center personnel will have access to your personally identifiable health

---

[2] *Id.*

[3]     *New York Blood Center Enterprises Community Report*, NYBCE, https://www.nybce.org/wp-content/uploads/2022/11/nybcenterprisescommunityreport-3.pdf (last accessed Sept. 18, 2025).

[4] *See HIPAA Information*, NYBCE, https://www.nybce.org/hipaa-information/ (last accessed Sept. 18, 2025).

[5] *E.g.*, *Use of Donor Information and Blood Samples in Research*, NYBC, https://www.nybc.org/donate-blood/donation-faqs/use-of-donor-information-and-blood-samples-in-research/#accordion-item-howismyprivacyprotectedwhenmydonorinformationbloodandbloodsamplesareusedinresearch (last accessed Sept. 18, 2025).

information" and that "your personally identifiable health information will not be shared with others."[6]

23.     Plaintiff and Class members entrusted NYBC with their PII/PHI in connection with receiving blood donation services or other medical care from NYBC.

### *The Data Breach*

24.     Between approximately January 20 and January 26, 2025, an unauthorized third party gained access to NYBC's network systems and acquired files containing the PII/PHI of its patients, including their names, demographic information, Social Security numbers, driver's license or other government identification card numbers, health information, and test results.[7]

25.     Despite discovering the Data Breach on or about January 26, 2025, NYBC waited until approximately September 5, 2025—over seven months after the Data Breach—to begin notifying Plaintiff and Class members that the Data Breach occurred and that their PII/PHI was accessed and acquired by unauthorized persons.[8]

26.     Defendant acknowledges that the Data Breach places Plaintiff and Class members in imminent danger of fraud and identity theft. The data breach notice letter warns Plaintiff and Class members to remain "vigilant for incidents of fraud or identity theft" and review their account statements and credit reports for suspicious activity.[9]

---

[6] *Id.*

[7] *See Notice to Clinical Services Recipients*, NYBCE (Sept. 5, 2025), https://www.nybce.org/news/articles/cyber/; New York Blood Center Enterprises, *see also Notice Letter*, MAINE ATT'Y GEN. (Sept. 5, 2025), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/28e4afad-d13c-41b4-822e-f3a114a64a14.html.

[8] *See Notice Letter*, *supra* note 7.

[9] *Id.*

27.    Defendant's failure to promptly notify Plaintiff and Class members that their PII/PHI was disclosed, accessed, and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

### *Defendant Knew that Criminals Target PII/PHI*

28.    At all relevant times, Defendant knew, or should have known, that the PII/PHI that it collects and stores was a target for malicious actors. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from unauthorized disclosures and cyberattacks that it should have anticipated and guarded against.

29.    It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[10]

---

[10] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

30.    Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in 2024.[11] The company found that 23% of the breaches that it handled responses for were from the healthcare industry, up from 18% in 2023.[12]

31.    PII/PHI is a valuable property right.[13] The value of PII/PHI as a commodity is measurable.[14] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[15] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[16] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

32.    As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various internet websites

---

[11] *Data Breach Outlook*, KROLL, https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025    (last accessed Sept. 18, 2025).

[12] *See id.*

[13] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[14] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[15] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[16] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

33.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[17] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[18]

34.    All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[19] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[20]

35.    Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[21] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals

---

[17] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black).

[18] *Id.*

[19] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[20] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (Apr 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[21] Steager, *supra* note 17.

understand the power of coercion and extortion . . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[22]

36.     Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[23]

### *Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

37.     Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[24]

38.     Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without

---

[22] *Id.*

[23] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[24] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Sept. 18, 2025). The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[25]

39.     Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims needed more than a month to resolve issues stemming from identity theft.[26]

40.     Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[27] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[28] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[29] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[30]

---

[25] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[26] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Sept. 18, 2025).

[27] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[28] *See* Federal Bureau of Investigation, *supra* note 20.

[29] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Sept. 18, 2025).

[30] *Id.*

41.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a.      Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b.      Significant bills for medical goods and services neither sought nor received.

c.      Issues with insurance, co-pays, and insurance caps.

d.      Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e.      Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

f.      As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g.      Phantom medical debt collection based on medical billing or other identity information.

h.      Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[31]

42.     There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been

---

[31] *See* Dixon & Emerson, *supra* note 27.

stolen and used, but it takes some individuals up to three years to learn that information.[32]

43.    It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black market.

### *Damages Sustained by Plaintiff and Class Members*

44.    Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the disclosure, compromise, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI, which remains in Defendant's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

### CLASS ALLEGATIONS

45.    This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

46.    Plaintiff brings this action on behalf of himself and all members of the following Class of similarly situated persons:

---

[32] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

All persons whose PII/PHI was accessed in the Data Breach by unauthorized persons, including all who were sent a notice of the Data Breach.

47.    Excluded from the Class are New York Blood Center, Inc. and its affiliates, parents, subsidiaries, employees, officers, agents, board members, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

48.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

49.    The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. NYBC has reported to the Oregon Department of Justice that approximately 193,822 persons were affected by the Data Breach.[33]

50.    Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

    a.  whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

    b.  whether Defendant had duties not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

    c.  whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

    d.  whether an implied contract existed between Class members and Defendant providing that Defendant would implement and maintain

---

[33] *See Search Data Breaches*, JUSTICE.OREGON.GOV, https://justice.oregon.gov/consumer/DataBreach/ (last accessed Sept. 18, 2025).

       reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

    e.  whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiff and Class members;

    f.  whether Defendant breached its duties to protect Plaintiff's and Class members' PII/PHI; and

    g.  whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

51.    NYBC engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

52.    Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by NYBC, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

53.    Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

54.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be

encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against NYBC, so it would be impracticable for Class members to individually seek redress from NYBC's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

55.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

56.    NYBC owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII/PHI in its possession, custody, or control.

57.    NYBC knew or should have known the risks of collecting and storing Plaintiff's and all other Class members' PII/PHI and the importance of maintaining secure systems. NYBC knew or should have known of the many data breaches that targeted entities that collect and store PII/PHI in recent years.

58.     Given the nature of NYBC's business, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, NYBC should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

59.     NYBC breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and Class members' PII/PHI.

60.     It was reasonably foreseeable to NYBC that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

61.     But for NYBC's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

62.     As a result of NYBC's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise,

publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI, which remains in NYBC's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

## COUNT II
## NEGLIGENCE PER SE

63.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

64.    NYBC's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

65.    NYBC's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as NYBC, of failing to employ reasonable measures to protect and secure PII/PHI.

66.    NYBC violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and other Class members' PII/PHI, by failing to provide timely notice, and by not complying with

applicable industry standards. NYBC's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

67.    NYBC's violation of the HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

68.    Plaintiff and Class members are within the class of persons that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

69.    The harm occurring as a result of the Data Breach is the type of harm that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Breach.

70.    It was reasonably foreseeable to NYBC that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

71.     The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of NYBC's violations of the HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI, which remains in NYBC's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

## COUNT III
## BREACH OF FIDUCIARY DUTY

72.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

73.     Plaintiff and Class members gave NYBC their PII/PHI in confidence, believing that NYBC would protect that information. Plaintiff and Class members would not have provided NYBC with this information had they known it would not be adequately protected. NYBC's acceptance and storage of Plaintiff's and Class members' PII/PHI created a fiduciary relationship between NYBC and Plaintiff and Class members. In light of this relationship, NYBC must act primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiff's and Class members' PII/PHI.

74.     Due to the nature of the relationship between NYBC and Plaintiff and Class members, Plaintiff and Class members were entirely reliant upon NYBC to ensure that their PII/PHI was adequately protected. Plaintiff and Class members had no way of verifying or influencing the nature and extent of NYBC's data security policies and practices, and NYBC was in an exclusive position to guard against the Data Breach.

75.     NYBC has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of their relationship. It breached that duty by failing to properly protect the integrity of the system containing Plaintiff's and Class members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Class members' PII/PHI that it collected.

76.     As a direct and proximate result of NYBC's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI, which remains in NYBC's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

<u>COUNT IV</u>
**BREACH OF IMPLIED CONTRACT**

77.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

78.     In connection with receiving blood donation services or other medical care, Plaintiff and all other Class members entered into implied contracts with NYBC.

79.     Pursuant to these implied contracts, Plaintiff and Class members provided blood to NYBC and provided NYBC with their PII/PHI. In exchange, NYBC agreed to, among other things, and Plaintiff and Class members understood that NYBC would: (1) obtain blood from Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; and (3) protect Plaintiff's and Class members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

80.     The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and NYBC, on the other hand. Indeed, as set forth supra, NYBC recognized the importance of data security and the privacy of its patients' PII/PHI. Had Plaintiff and Class members known that NYBC would not adequately protect their PII/PHI, they would not have received blood donation or other services from NYBC.

81.     Plaintiff and Class members performed their obligations under the implied contract when they provided NYBC with their PII/PHI and provided their blood to NYBC.

82.     NYBC breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI, and in failing to implement and maintain security

protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

83.    NYBC's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

84.    Plaintiff and all other Class members were damaged by NYBC's breach of implied contracts because: (i) they face a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) their PII/PHI was improperly disclosed to unauthorized individuals; (iii) the confidentiality of their PII/PHI has been breached; (iv) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; and (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

**COUNT V**
**UNJUST ENRICHMENT**

85.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

86.    This claim is pleaded in the alternative to the breach of implied contract claim.

87.    Plaintiff and Class members conferred a monetary benefit upon NYBC in the form of blood donated to NYBC and through the provision of their PII/PHI.

88.    NYBC accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. NYBC benefitted from the receipt of Plaintiff's and Class

members' PII/PHI, as this was used to provide blood donation services or other services. NYBC used Plaintiff's and Class members' donated blood to obtain monies.

89.    As a result of NYBC's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between the blood they donated with reasonable data privacy and security practices and procedures, that Plaintiff and Class members expected, and the value of the blood they donated without reasonable data privacy and security practices and procedures, that they received.

90.    NYBC should not be permitted to retain the money that NYBC received for the blood that Plaintiff and Class members donated because NYBC failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members expected and that were otherwise mandated by federal, state, and local laws and industry standards.

91.    Plaintiff and Class members have no adequate remedy at law.

92.    NYBC should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

### COUNT VI
### VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
### Conn. Gen. Stat. § 42-110a, *et seq.* ("CUTPA")

93.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

94.    Conn. Gen. Stat. § 42-110b states, "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

95.    NYBC, Plaintiff, and Class members are "persons" within the meaning of CUTPA. See Conn. Gen. Stat. § 42-110a(3).

96.    The services that NYBC provides are "trade" and "commerce" within the meaning of CUTPA. See Conn. Gen. Stat. § 42-110a(4).

97.    NYBC made representations to Plaintiff and Class members that their information would remain confidential.

98.    NYBC did not disclose to Plaintiff and Class members that its data security was inadequate.

99.    NYBC violated the CUTPA through its failure to adequately safeguard and maintain Plaintiff's and Class members' PII/PHI.

100.    NYBC's failure to adequately safeguard and maintain Plaintiff's and Class members' PII/PHI offends public policy, as NYBC owed a duty to Plaintiff and Class members to protect their PII/PHI and breached that duty.

101.    NYBC's violations of CUTPA are immoral, unethical, oppressive, or unscrupulous, as demonstrated by Plaintiff's allegations set forth above.

102.    As a result of NYBC's above-described conduct, Plaintiff and Class members have suffered damages from the disclosure of their information to unauthorized individuals.

103.    The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of NYBC's violations of the CUTPA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI;

(iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI, which remains in NYBC's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

104.    Plaintiff, individually, and for each member of the Class, seeks damages for his and Class members' injuries and punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a) and attorneys' fees, litigation expenses, and court costs pursuant to Conn. Gen. Stat. § 42-110g(d).

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to

safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: September 18, 2025                     Respectfully submitted,

/s/
Adam Pollock
**POLLOCK COHEN LLP**
111 Broadway, Suite 1804
New York, NY 10006
Tel: 212-337-5361
adam@pollockcohen.com

Ben Barnow
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiff*

*Pro hac vice* forthcoming